SO ORDERED.

SIGNED this 29 day of September, 2014.

_____
**Randy D. Doub**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

TERRY EUGENE SLATE,                    CHAPTER 11
AND LYNN SKIPPER SLATE,                CASE NO. 14-03302-5-RDD

                    DEBTORS.

## ORDER DENYING EMERGENCY MOTION
## TO HOLD AERL, L.C., AND PNC BANK, NA IN CONTEMPT

This Matter comes before the Court on the Emergency Motion filed by Terry Eugene Slate and Lynn Skipper Slate (the "Debtors") on September 8, 2014, to Hold AERL, L.C. and PNC Bank, NA in Contempt. The Court conducted a hearing on this matter on September 10, 2014 in Raleigh, North Carolina.

### BACKGROUND

On August 27, 2014, after a lengthy hearing, this Court approved two leases, one for a building located at 8013 Purfoy Rd. Fuquay-Varina, NC (the "larger building") and the other for a building located 8005 and 8009 Purfoy Rd. Fuquay-Varina, NC (the "smaller building"), over the objections of AERL, L.C. and PNC Bank, NA. The Orders Granting the Motions to Approve Lease Agreements were entered on September 5, 2014. Both leases contain an Article XIX titled

1

"Subordination, Non-Disturbance and Attornment Agreement," which is commonly known as an "SNDA".[1] The final sentence in Article XIX states that "Landlord shall be obligated to obtain an SNDA, in a form and content satisfactory to Landlord's lender and Tenant, and Tenant's receipt of such SNDA executed by Landlord's lender shall be a condition precedent to Tenant's obligation to pay rent under this Lease."

While the Orders of September 5, 2014, approved the leases, they did not specifically set forth whether AERL, L.C. and PNC Bank, NA were required to execute SNDAs. It was, however, implied within the Court's order that AERL, L.C. and PNC Bank, NA were required to execute SNDA's as the lease agreements before the Court required the "Landlord . . . to obtain an SNDA."

Following the hearing on the lease Motions, AERL, L.C. and PNC Bank, NA began negotiating the SNDA terms with Column & Post, Inc., the tenant under the leases. However, the two secured lenders expressed their uncertainty regarding whether the Court intended to require them to affirmatively sign SNDAs and if so, whether they were required to execute SNDAs in any particular form or how any disagreement regarding the proposed terms of the SNDA should be resolved. After unsuccessful attempts to reach resolution, on September 8, 2014, the Debtors filed an Emergency Motion to Hold AERL, L.C. and PNC Bank, NA in Contempt and to Delay Adequate Protection Payments.

At the hearing on the Contempt motion, counsel for the Debtors stated that he had no wish for AERL, L.C. and PNC Bank, NA to be held in contempt, provided that the SNDAs were

---

[1] Essentially under this SNDA, the lenders have to honor the lease in the event of a foreclosure. For example, if the tenant is in the space and current on its rent (and not otherwise in default), and if either one of these secured creditors forecloses on the building, then the lease remains in place, and the third-party purchaser at foreclosure buys the property subject to this lease. The SNDA also protects the lender from the tenant backing out of the lease in the event of foreclosure.

signed. Counsel for all parties in interest present at the hearing indicated that progress had been made toward negotiating the terms of SNDAs satisfactory in form and content to AERL, L.C. and PNC Bank, NA, but that clarification was needed as to whether the Court intended to require the secured lenders to sign SNDAs over their objection, and if so, in what form.

## DISCUSSION

Section 363 of the Bankruptcy Code provides that, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (2014). Section 363 "has no carveouts from its grant of authority when applied in cases under chapter 11." In re Gen. Motors Corp., 407 B.R. 463, 486 (Bankr. S.D.N.Y. 2009). Nor does section 363 provide that "it may not be used in chapter 11 cases for dispositions of property exceeding any particular size, or where the property is of such importance that it should alternatively be disposed of under a plan." Id. Further, section 363 "does not require a Chapter 11 debtor to propose a plan of reorganization before it moves to sell its assets outside the ordinary course of business." In re Taylor, 198 B.R. 142, 156-57 (Bankr. D.S.C. 1996) (citing In re WBQ P'ship, 189 Bankr. 97, 102 (Bankr. E.D. Va. 1995)).

To prevent debtors from using section 363(b) as a vehicle for circumventing the creditor protections afforded under Chapter 11 plans, courts have imposed their own non-statutory requirements for allowing liquidation sales before plan confirmation. Id. Concerning court approval of a sale of assets under section 363, the overriding consideration is "whether a 'good business reason' has been articulated." In re Motors Liquidation Co., 430 B.R. 65, 83 (S.D.N.Y. 2010). "More recent decisions have determined that pre-confirmation sales are permissible 'when a sound business purpose dictates such action.'" In re Taylor, 198 B.R. at 156-57 (citing In re WBQ P'ship, 189 Bankr. at 102).

3

The Taylor court described the test for a sale as having four elements. "A trustee or debtor-in-possession has the burden of proving that (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable." Id. Citing the decision in Comm. Of Equity Sec. Holders v. Lionel Corp., 722 F.2d 1063 (2d Cir. 1893), the General Motors court listed the following factors to consider: "(a) the proportionate value of the asset to the estate as a whole; (b) the amount of elapsed time since the filing; (c) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (d) the effect of the proposed distribution on future plans of reorganization; (e) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (f) which of the alternatives of use, sale or lease the proposal envisions; and (g) whether the asset is increasing or decreasing in value." Id. at 490. The General Motors court suggested the following four factors as additions to the nonexclusive Lionel list: "(h) Does the estate have the liquidity to survive until confirmation of a plan? (i) Will the sale opportunity still exist as of the time of plan confirmation? (j) If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors? [a]nd (k) Is there a material risk that by deferring the sale, the patient will die on the operating table?" Id.

Here, the Debtors and creditors presented evidence that: 1) the property in question is difficult to lease; 2) the proposed leases are at above market rates at $3.25 per square foot and are more than sufficient to service the debt; 3) the new owner of the tenant intends to infuse significant new funds into the tenant; 4) the expense of moving the tenant and the downtime associated with the move would be significant, thus requiring a long-term lease; and 5) the tenant

will not enter into the leases without SNDAs. AERL, L.C. presented the expert witness testimony of Jackson Rives, III, who is experienced in commercial real estate, brokerage, and industrial leasing in the Raleigh-Durham area. Mr. Rives described the larger building as having an "awkward" layout in that half of the building had dock doors on the front side of the building and the other half of the building had dock doors on the back side of the building. Mr. Rives noted that this "awkward" layout was a concern for a potential buyer. He also pointed out that a potential buyer would likely want to remove the smaller building in front because in his opinion the smaller building was an obstruction to the larger building being a "true warehouse" or "distribution building." Mr. Rives testified that the loading docks, the equipment, the truck court, and the interior of the larger building all needed repairs. In his opinion, the total cost of improvements would cost anywhere from $400,000.00 to $550,000.00. In the current condition, Mr. Rives testified he would expect to rent the building for approximately $2.25 to $2.50 per square foot. Mr. Rives further testified that since October 2013, when he first became aware that the larger building was on the market, he had not shown the building to any of his clients. The male debtor testified that since the property has been listed on the market he has not had any proposals from parties to lease all or part of the building. The Debtors noted that the lease agreement as to the larger building provides for a monthly rental rate of $3.25 per square foot, which is above the market rate as testified to by Mr. Rives. The Debtors also presented testimony that it would be very costly and take a lot of time for Column & Post, Inc., the tenant under the leases, to move, effectively putting it out of business.

The proposed leases provide for a rental rate of $3,500.00 per month for the smaller building and a rental rate of $19,000.00 per month for the larger building. The Debtors propose to use their rent proceeds to pay adequate protection payments to AERL, L.C. and PNC Bank,

N.A., with the remainder going to building related expenses. Without executed SNDAs, the leases cannot take effect.

This Court finds that the Debtors have carried their burden of proof. The Debtors have shown by a preponderance of the evidence that the Debtors demonstrated a sound business reason and negotiated the best lease possible under the circumstances, which justifies the pre-confirmation lease agreements. The leases have been proposed in good faith, and the interested parties received adequate and reasonable notice of the leases. Additionally, the terms of the lease agreements are fair and reasonable, and SNDAs signed by AERL, L.C. and PNC Bank, NA are an inseparable portion of the proposed lease agreements in this case[2]. AERL, L.C. and PNC Bank, NA have voluntarily negotiated terms of the SNDA and they have not been in willful contempt of the orders of this Court. Because the parties and the tenant reported to the Court that they are able to agree on forms and content of SNDAs satisfactory to each of them, this Court need not rule upon what particular form of SNDA must be signed.

## **CONCLUSION**

Therefore, based on the foregoing, the Emergency Motion to Hold AERL, L.C. and PNC Bank, NA in Contempt is **DENIED**; and

---

[2] SNDAs are commonly required with commercial leases. The requirement of SNDAs was discussed in In re Gen Growth Props., Inc., 406 B.R. 171, 174 (Bankr. S.D.N.Y. 2009). In Gen. Growth, the Debtors were ordered to enter into good faith discussions with the Adequate Protection Parties regarding modifications to the SNDAs, "provided that any such standardized modifications shall not unreasonably delay or impair the Debtors' leasing activities." Id. Approving a procedure for leases, the court ordered: "[I]f an Adequate Protection Party fails to timely honor a request by the Debtors for execution of . . . a subordination, non-disturbance and attornment agreement . . . in favor of a tenant or proposed tenant . . . then the Debtors shall have the right to a hearing and to seek appropriate relief from the Court on an expedited basis, including, but not limited, pursuant to *section 362(a)(3) of the Bankruptcy Code* or for modification of adequate protection." Id. (emphasis in original).

The Orders Granting Motions to Approve Lease Agreements between the Debtors and Column & Post, Inc. are **APPROVED** and clarified to require AERL, L.C. and PNC Bank, NA to execute SNDAs and deliver the signed SNDAs to the Debtors.

**SO ORDERED.**

**END OF DOCUMENT**